# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| CHEHALIS CHILDREN'S CLINIC, P.S., | No.  49569-4-II |
| Appellant, | |
| v. | |
| WASHINGTON STATE HEALTH CARE AUTHORITY, | UNPUBLISHED OPINION |
| Respondent. | |

WORSWICK, J. — The Washington Health Care Authority (Agency)[1] overpaid Chehalis

Children's Clinic (Clinic) for services rendered to Medicaid patients.  Chehalis appeals an order

affirming the Washington State Health Care Authority Board of Appeals (Board) decision that

equitable estoppel does not preclude the Agency from recovering the overpayment.  The Clinic

argues that some of the Board's findings of fact are not supported by substantial evidence and

that the Board improperly interpreted the law by concluding that the Clinic had not established

all the elements of equitable estoppel by clear, cogent, and convincing evidence.  We affirm the

Board's order because substantial evidence supports the challenged findings and because the

Clinic failed to establish equitable estoppel.

---

[1] The Health Care Authority (HCA) became the State's designated state agency to administer
the Medicaid program in 2011.  RCW 71.04.050(2).  Prior to 2011, the Department of Social and
Health Services (DSHS) administered the Medicaid program.  Because this case spans multiple
years and involves references to both DSHS and the HCA, we use the term "Agency" when
referring to either the HCA or DSHS.

FACTS

I. BACKGROUND

Congress provides federal funds to the States to provide medical services for needy citizens through Medicaid. *In re Guardianship of Lamb*, 173 Wn.2d 173, 186, 265 P.3d 876 (2011). Participation in Medicaid is voluntary but, once a state elects to participate, it must comply with Medicaid statutes and related regulations. *Samantha A. v. Dep't of Soc. Servs. & Health Servs.*, 171 Wn.2d 623, 630, 256 P.3d 1138 (2011). States design and administer their Medicaid programs within federal guidelines. *Caritas Servs., Inc. v. Dep't of Soc. & Health Servs.*, 123 Wn.2d 391, 396, 869 P.2d 28 (1994). A description of a state's implementation of federal guidelines must be submitted in a document known as a "State Medicaid [P]lan" to the federal Centers for Medicaid Services (CMS) for approval. 42 U.S.C. § 1396a(33); 42 C.F.R. § 403.304(b)(1). The Agency administers the Medicaid program in Washington. RCW 74.04.050; RCW 74.09.500.

Each state's plan establishes, among other things, a method for reimbursing health care providers, such as rural health clinics (RHCs). *See* 42 U.S.C. § 1396a(bb)(5)-(6). RHCs are clinics located in rural areas that engage in primarily outpatient or ambulatory care typically provided in a physician's office or an outpatient clinic. All state plans must include a scheme for reimbursing RHCs for each encounter the clinics have with Medicaid recipients.[2] *See* 42 U.S.C. § 1396a(bb)(5)-(6). An encounter is a face-to-face visit between an RHC provider and a recipient. Former WAC 388-549-1100 (2008).

---

[2] Under federal law, RHCs also receive payment for services provided to Medicare recipients. However, this case only involves services provided by an RHC to Medicaid recipients.

The RHC's reimbursement structure under Medicaid is different than that of the standard medical office. *See* 42 U.S.C. § 1396a(bb)(6). Under the Medicaid program, reimbursement payments owed by the Agency to RHCs are assessed through what is known as the Prospective Payment System (PPS). Under this system, the Agency pays 100 percent of the average cost per each encounter of a Medicaid recipient. Additionally, RHCs can elect to be reimbursed through what is known as the alternative payment methodology (APM).[3] This reimbursement method utilizes different, more recent data than the PPS, however, under the APM the Agency must still provide a payment to the RHCs which results in a payment at least equal to what the RHC would receive if using the PPS. 42 U.S.C. § 1396a(bb)(6)(B). In other words, under the APM, the Agency must still ensure that the RHCs receive at least 100 percent of the cost of each encounter.

In Washington, RHCs may also contract with managed care organizations (MCOs) to provide services to Medicaid recipients. WAC 182-549-1100. Medicaid recipients enroll with an MCO to receive services from certain providers. After providing services to MCO enrollees, an RHC will submit a claim for payment for services directly to the MCOs. The MCOs then determine whether the services provided by the RHCs were appropriate and, if so, the MCO pays the RHC a contracted amount.

Sometimes this contracted amount results in the RHC's receiving less than the amount they would receive had they been paid directly from the Agency under the PPS or APM. When the MCO payment for an encounter is less than the encounter rate the RHC would receive under the PPS or APM, the Agency must make supplemental payments to the RHCs so that the total payment received by them is equal to the total amount they are entitled to receive under the PPS

---

[3] For all times relevant in this case, the Clinic chose the APM.

or APM. 118; 42 USC 1396a(bb)(5)(A)-(B). These supplemental payments are known as enhancement payments. WAC 182-549-1100.

The Agency calculates enhancement payments based on documentation sent to it by the MCOs. The MCOs submit a roster of enrollees seen by an RHC to the Agency and the Agency pays the RHCs an enhancement payment for each enrollee on the list. Enhancement payments are interim in nature and are made throughout the year until a reconciliation of the payments can be completed.[4] All RHCs are to be notified on an annual basis that a reconciliation will be conducted to compare what the RHCs actually received to what they should have received.

In summary, the RHCs are entitled to two payments for each encounter, one payment from the MCO and one enhancement payment from the Agency to supplement the MCO payment if the MCO payment does not cover the entire cost of the encounter. These two payments allow the RHCs to receive a total amount that equals the amount the RHC would receive had the Agency paid the RHC directly under the PPS or APM.

## II. WASHINGTON'S ENHANCEMENT PAYMENT PROCESS

After a federal audit in 2006, CMS found the Agency noncompliant with federal regulations regarding its enhancement payment method. Through the audit, CMS concluded that the Agency's current enhancement payment methodology did not meet federal Medicaid requirements because the Agency could not prove that RHCs received a total amount "exactly

---

[4] In finding of fact 8, the Board states that "RHCs receive enhancement payments from the Agency at the time the reconciliation occurs." AR at 2-3. However this is an incorrect statement. The Board properly notes in finding of fact 19 that "[t]he monthly enhancement payment is the interim payment methodology used during the calendar year until reconciliation can be completed. Once reconciliation is completed, then a comparison is done between the payments with the enhancement payments, and what the payments would have been under the encounter rate." AR at 7.

equal" to what the RHCs should receive. Admin. Record (AR) at 120. CMS then required the

Agency to develop a new methodology for making enhancement payments.

In 2008, the Agency informed the RHCs about the Agency's noncompliance and the plan

to develop an updated enhancement payment process. In a letter to the RHCs, the Agency stated:

> . . . According to CMS, the PPS methodology currently used by the [Agency] requires that overall reimbursement for eligible managed care visits must be **equal** to the encounter rate paid for eligible fee-for-service visits. The overall reimbursement is comprised of payments from the managed care organizations (MCO) and the enhancement payments from the [Agency]. If the MCO payment for a particular visit is less than the encounter rate, the [Agency] is responsible for making an enhancement payment in order to bring the total reimbursement up to the level of your encounter rate.
>
> The CMS review of the enhancements found insufficient evidence that the [Agency]'s methodology for making the payments meets federal requirements. Specifically, the [Agency] was unable to demonstrate that the payments were **exactly equal** to the difference between the MCO payments and your encounter rate.

AR at 120. The Agency also stated that it was developing a process for addressing

overpayments and underpayments when they exist. As a result, the Agency drafted a state plan

amendment that included a new enhancement payment and reconciliation process. The newly

amended plan stated in part:

> To ensure that the appropriate amounts are being paid to each clinic, the State will perform an annual reconciliation and verify that the enhancement payments made in the previous year were in compliance with Section 1902(bb)(5)(A)[ of the SSA]. The annual reconciliation will be done as follows:
>
> > APM: (managed care encounters x APM encounter rate) less (fee-for-service equivalent) = State's payment amount[.]

5

AR 125. CMS approved the Agency's amended state plan and it became effective in 2008.[5]

In 2009, the Agency sent a letter to the RHCs notifying them of the new enhancement process and of the Agency's expectation to complete a reconciliation of the 2009 enhancement payments in September 2010. The Agency also informed the RHCs that if the reconciliation showed that the Agency had overpaid the RHCs in enhancement payments, the RHCs would be responsible for repaying the overpaid amount.

Shortly after the agency implemented the reconciliation process in 2009, a group of health clinics sued the Agency over the propriety of the reconciliation process. As a result, the Agency stayed the reconciliation process until the parties resolved the suit in October 2013.

III. CHEHALIS CHILDREN'S CLINIC AND 2009 ENHANCEMENT PAYMENTS

The Clinic is an RHC that provides health care services to low-income children in a rural area. In 2005, the Clinic signed a core provider agreement with the Agency. After it signed the agreement, the Clinic was subject to state and federal laws as well as Agency rules, regulations, memoranda, billing instructions, and other agency documents. The Clinic chose the APM payment methodology and contracted with the Agency to provide Medicaid funded services to Medicaid recipients. Under the APM, the Agency paid an encounter rate for each Medicaid recipient encounter directly to the Clinic. In addition to providing services to Medicaid recipients, the Clinic also contracted with an MCO to provide services to MCO enrollees. Thus, the Clinic was entitled to payments from the MCO, and also entitled to enhancement payments

---

[5] Washington's Medicaid (Title XIX) State Plan is available at: https://www.hca.wa.gov/about-hca/apple-health-medicaid/medicaid-title-xix-state-plan. The 2008 State Plan Amendment is available at: https://www.hca.wa.gov/assets/program/08-010_FQHC_RHC_Approval_Pkt_(6-26-09).pdf

from the Agency when the MCO failed to provide the Clinic full payment for enrollee encounters.

In 2009, the MCO submitted a roster to the Agency and, based on this roster, the Agency paid the Clinic estimated enhancement payments for each enrollee listed. When the Clinic received the payments, its billing specialist recorded them as "revenue" or as an "income item." AR at 8.

After a reconciliation of the 2009 enhancement payments, the Agency determined that it had overpaid the Clinic in the amount of $216,336. Because the Clinic chose to participate in the APM, which utilized different data, and because it took the Agency some time to implement the APM changes after the Clinic chose that methodology, the rate the Agency paid the Clinic for each client visit in the first six months of 2009 was different than the rate that the Agency paid the Clinic for the last six months of 2009. As a result, the Agency adjusted the Clinic's debt by the difference between the two rates. Additionally, the state legislature inserted a provision in the operating budget for 2014 that forgave 65 percent of the 2009 overpayments made to RHCs. These combined actions reduced the Clinic's overpayment responsibility to $74,634.

In 2014, the Agency notified the Clinic of the final amount the Agency sought to recover. The Clinic did not reimburse the Agency but instead requested an administrative hearing to address the overpayment.

IV.  ADMINISTRATIVE HEARING

An administrative law judge (ALJ) with the Office of Administrative Hearings held a hearing on the matter. The Clinic disputed the Agency's calculation and further argued that even

if the Agency had overpaid the Clinic, the Agency was precluded from collecting the overpayment under equitable estoppel as described in WAC 182-526-0495.[6]

Several witnesses testified at the hearing. They included Sandra Cashman, a cost reimbursement analyst for the Agency; Lynn McCarty, a billing specialist for the Clinic; and Jenise Mugler, the Clinic's general administrator.

Cashman described the Agency's authority to recoup overpayments. She also testified that the Agency performed an annual reconciliation of the enhancement payments and explained that the Agency paid enhancement payments "in addition" to the amounts paid by the MCOs for each encounter. 1 Report of Proceedings (RP) at 24. Cashman also described the enhancement payment process. She explained that the MCO submitted, to the Agency, a roster of the enrollees to whom the Clinic provided services. The Agency then paid the estimated

---

[6] WAC 182-526-0495 provides:
  Equitable estoppel is a legal doctrine that may be used only as an affirmative defense to prevent the Agency from collecting an overpayment. WAC 182-526-0495. There are five elements of equitable estoppel and a party asserting the doctrine of equitable estoppel must prove all of the following five elements by clear and convincing evidence:
    (a) [The Agency] made a statement or took an action or failed to take an action, which is inconsistent with a later claim or position by [the Agency].
    (b) The party reasonably relied on [the Agency]'s original statement, action or failure to act.
    (c) The party will be injured to its detriment if [the Agency] is allowed to contradict the original statement, action or failure to act.
    (d) Equitable estoppel is needed to prevent a manifest injustice. Factors to be considered in determining whether a manifest injustice would occur include, but are not limited to, whether:
    (i)  The party cannot afford to repay the money to [the Agency];
    (ii)  The party gave [the Agency] timely and accurate information when required;
    (iii)  The party did not know that [the Agency] made a mistake;
    (iv) The party is free from fault; and
    (v)  The overpayment was caused solely by an [Agency] mistake.
    (e)  The exercise of government functions is not impaired.

enhancement payments to the Clinic for the same services provided to the enrollees on the roster. Cashman further testified that when an RHC is overpaid, the Agency recoups the amount that was overpaid, and if an RHC is underpaid, the Agency pays the RHC the difference.

McCarty testified that the Clinic received enhancement payments from the Agency in 2009. McCarty explained that she did not invoice the Agency for the enhancement payments and that upon receipt of enhancement payments, she did not take any action to reconcile the payments with the MCO payments. She also testified that she never recorded or classified any of the enhancement payments as "advanced" payments or as money that would have to be repaid to the Agency. AR at 8. McCarty further testified that she assumed that the enhancement payments were reconciled by the Agency.

Mugler has worked at the Clinic for 22 years in various capacities. Mugler believed that enhancement payments were an additional source of "income" paid to the Clinic by the Agency in addition to the encounter payments. 1 Verbatim Report of Proceedings (VRP) at 61. Mugler further stated that if the Clinic had to repay the overpayment, the survivability of the clinic would be in question, and that the Clinic did not have $74,634 "sitting in a bank account." AR at 9. Mugler testified that it would be difficult for the Clinic to keep its doors open even if the Agency were to provide the Clinic with a repayment plan.

After the hearing, the ALJ entered an order and concluded that the Clinic established all five elements of equitable estoppel by clear, cogent, and convincing evidence and therefore the Agency could not recoup the $74,634 overpayment. The Agency appealed the ALJ's decision to the Health Care Authority Board of Appeals.

## V. HEALTH CARE AUTHORITY BOARD ADJUDICATION

The Board reversed the ALJ's decision and entered a final order that included specific findings of fact and conclusions of law. The Board found that the reconciliation process ensured that the RHCs were paid the appropriate amounts. The Board further found that the enhancement payments were interim payments made throughout the year until a reconciliation of the payments could be completed.

The Board also found that the Agency notified the Clinic in 2008 via letter about the earlier federal audit and the Agency's noncompliance with the enhancement process. The Board found that the Agency informed the RHCs that it was working to create a new enhancement payment methodology and reconciliation process because the previous process could not guarantee that the total amount received by the RHCs was "exactly equal" to the amount that the Clinic ought to receive for each encounter. AR at 5. The Board also found that the 2008 letter referred to the Agency's expectation to reconcile future payments and develop a process to resolve underpayments and overpayments.

The Board found that if the Agency determined through reconciliation that an RHC was overpaid, the Agency would recoup the overpaid amount and if an RHC was underpaid, the agency would pay the difference owed to the RHC. The Board additionally found that the Agency sent out many communications to the RHCs regarding the 2009 reconciliation.

The Board also entered a number of conclusions of law. The Board concluded that the Clinic did not prove by clear, cogent, and convincing evidence that equitable estoppel applied to preclude the Agency from recouping any overpayment. Specifically, the Board determined that

10

the Clinic failed to establish three of the five equitable estoppel elements—reasonable reliance, manifest injustice, and impairment of governmental functions.

Regarding reasonable reliance, the Board found that the Clinic knew that it must comply with federal law and that the Agency informed the Clinic of the 2006 audit results and the requirement that the enhancement payments needed to be "exactly equal" to the difference between the encounter rate and the rate paid by the MCOs. AR at 18. The Board also found that the Agency informed the Clinic that it was developing a process for dealing with underpayments and overpayments. Based on these facts, the Board concluded that it was not reasonable for the Clinic to believe that it would not be subject to an enhancement payment reconciliation and that it was not reasonable for the Clinic to believe that enhancement payments were simply additional income given to it by the Agency.

The Board further concluded that preventing the Agency from recouping the overpayment from the Clinic would impair government functions. The Board reasoned that government functions would be impaired if the Agency was precluded from recovering the overpayment from the Clinic because the Agency would be prevented from complying with federal Medicaid law and other related federal instructions.

VI. APPEAL TO THE SUPERIOR COURT

The Clinic appealed the Board's decision to the superior court. The superior court affirmed the Board's order and agreed that the Clinic did not establish all elements of equitable estoppel to preclude the Agency from recouping the overpayment. The Clinic now appeals.

11

ANALYSIS

The arguments in this case are unique because the Clinic asks us to resolve only the issue of equitable estoppel. The Clinic affirmatively states that it does not want us to determine the propriety of the Agency's ability to seek recoupment for enhancement overpayments. Whether the Agency can seek recoupment is a threshold issue in this matter. Nonetheless, we accept the issue as presented by the Clinic, assume without deciding that the Agency can seek recoupment, and resolve the issue of equitable estoppel.[7]

The Clinic argues that the Board incorrectly concluded that the Clinic failed to establish all elements of equitable estoppel by clear, cogent, and convincing evidence. The Clinic also asserts that a number of the Board's findings of fact are not supported by substantial evidence or are improperly interpreted. The Clinic additionally claims it does not admit unchallenged findings or conclusions of law as verities on appeal. We affirm the Board's order and hold that CCC did not meet its burden to show equitable estoppel.

## I. THE BOARD'S FINDINGS OF FACT

The Clinic challenges five of the Board's findings of fact, claiming that they are not supported by substantial evidence or that they are improper. The Clinic challenges the Board's

---

[7] The Clinic asserts that the "only issue on appeal is whether equitable estoppel precludes collection of the claimed overpayment." Reply Br. at 1-2. However, the Clinic has assigned error to the Board's conclusion that under federal law, the Agency has the legal authority to recoup the enhancement payment. The Clinic has also assigned error to the Board's conclusion that expert testimony is not helpful when the case turns an issue of law. The Clinic makes no legal argument in support of these assignments of error, thus we do not address them, but instead consider the conclusions correct for purposes of this appeal. 12. RAP 10.3(a)(6), *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 808, 225 P.3d 213 (2009).

findings of fact 8, 11, 12, 20, and 30. We hold that these findings are supported by substantial evidence.

A.     *Standard of Review*

Under the Washington Administrative Procedure Act, chapter 34.05 RCW, we directly review the Board's decision based on the record before the agency to see whether substantial evidence supports the Board's decision. *Pilchuck Contractors, Inc. v. Dep't of Labor & Indus.*, 170 Wn. App. 514, 517, 286 P.3d 383 (2012). We view the evidence in the light most favorable to the party that prevailed before the highest forum that exercised fact-finding authority, here the Agency. *Miotke v. Spokane County*, 181 Wn. App. 369, 376, 325 P.3d 434, *review denied*, 181 Wn.2d 1010 (2014). "Substantial evidence" is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises. *Pilchuck Contractors*, 170 Wn. App. at 517. We do not reweigh the evidence. *Harrison Mem'l Hosp. v. Gagnon*, 110 Wn.App. 475, 485, 40 P.3d 1221 (2002). Unchallenged findings of fact are verities on appeal. *Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus.*, 136 Wn. App. 1, 4, 146 P.3d 1212 (2006).

B.     *Unchallenged Findings*

As a preliminary matter, we address the Clinic's claim that it does not admit unchallenged findings of fact as verities on appeal. The Clinic asserts that because many of the Board's findings of fact and conclusions of law are not related to the issue of equitable estoppel, it does not assign error to all the Board's findings and conclusions. The Clinic further claims that though it does not cite or assign error to other findings of fact, it does not admit any unchallenged findings as verities on appeal.

Under the Rules of Appellate Procedure, an appellant must separately assign error to each finding that he challenges on appeal, must identify each challenged finding by number, and must separately assign error to any challenged administrative findings. RAP 10.8(g)-(h). Where an appellant fails to assign error to administrative findings, we treat those findings as verities unless the appellant's briefing makes it clear which findings he is challenging and on what grounds he challenges them. *Bircumshaw v. State*, 194 Wn. App. 176, 198, 380 P.3d 524 (2016).

The Clinic cites to no authority to support its contention that a party can prevent unchallenged findings of fact from becoming verities on appeal simply by stating that they do not "admit" as verities findings of fact unrelated to the issue on appeal. Accordingly, for purposes of this appeal, we accept as verities all unchallenged findings of fact.

C.     *The Board's Challenged Findings Are Supported by Substantial Evidence*

The Clinic challenges the Board's findings of fact 8, 11, 12, 20, and 30, claiming that they are not supported by substantial evidence or are otherwise improper.    We hold that each finding is supported by substantial evidence.

The Clinic first assigns error to the trial court's finding of fact 8, which states:

> An enhancement payment is a monthly amount paid to RHCs for each client enrolled with a managed care organization (MCO). The MCO contracts with RHCs to provide services under the Healthy Options plan. RHCs receive enhancement payments from the Agency at the time the reconciliation occurs. Enhancement payments are made in addition to the negotiated payment the RHC receives from the MCO for the same services. In 2009, enhancement payments were made based on rosters that were submitted by the MCO. The roster is a list of clients by name and the key identifier that is assigned by the MCO to each clinic. The rosters were then uploaded into the [] payment system and the RHC[']s enhancement payment was applied to each client that was associated with the clinic.

Clerk's Papers (CP) at 12-13 (citations omitted).

14

The Clinic argues that the Board's description of an enhancement payment, method of calculation, and method of payment is incorrect because the description does not "comport" with WAC 182-549-1100 and WAC 182-549-1400. Br. of Appellant at 9. The Clinic argues that an enhancement payment is not just defined as a monthly amount paid to RHCs for each client enrolled with an MCO, but is further defined as a payment received by a provider from the Agency in addition to the negotiated payments the providers receive from MCOs for services to enrollees. The Clinic asserts that the fact that enhancements are made in addition to other payments made to RHCs is the "most critical part" of the definition, and the failure of the Board to consider that is an "obvious and fatal" error. Br. of Appellant at 9.

The Clinic's argument is a legal objection to a finding of fact. We review findings of fact to determine whether the findings are supported by substantial evidence. *Pilchuck*, 170 Wn. App. at 517. Other than the inconsequential error we mention in footnote 5, finding of fact 8 is supported by substantial evidence.

Here, Cashman testified that enhancement payments are payments made by the Agency "in addition to the amounts paid by the managed care organizations." 1 VRP at 24. Additionally, unchallenged finding of fact 15 states that "the contracted amount that the MCO pays, in addition to the enhancement payment paid by the agency, makes the RHC whole." AR at 4.

Further, the record supports the finding that enhancement payments are related to services. Cashman testified that the enhancement payment process operates by the MCO submitting to the Agency a list of enrollees to whom the Clinic provided services. At the time the MCOs submit the list to the Agency, the MCOs have already paid the Clinic for the services.

15

The estimated enhancement payments are then paid by the Agency to the Clinic based on the list of enrollees who received services from the Clinic, the same services for which the Clinic already received the MCO payment for. Therefore, based on this evidence, the Board's finding is supported by substantial evidence.

The Clinic also assigns error to the trial court's finding of fact 11, which states:

> Reconciliation is the process whereby the Department ensures that the appropriate amount was paid to the RHC. The Department performs an annual reconciliation of the enhancement payment. Because the Appellant used the APM, the reconciliation would be based on the following formula: (Managed care encounters) x (APM encounter rate) less (fee-for-service equivalent) = State's payment amount.

CP at 13.

The Clinic argues that this finding is erroneous because the Agency did not conduct a reconciliation of the 2009 enhancement payments until 2013 and that to make a finding that the Agency performs an "annual" reconciliation is therefore erroneous. Br. of Appellant at 10.

Here, Cashman testified that the Agency performs an annual reconciliation of the enhancement payments made to the RHCs. Thus, finding of fact 11 is supported by substantial evidence.

The Clinic also assigns error to the Board's finding of fact 12, which states:

> After reconciliation, if the Agency determines that the RHC was overpaid, the [Agency] will recoup the overpayment amount; if the RHC was underpaid, the Agency will pay the difference owed. Enhancement payments exist in an effort to estimate, during the year, the full payment allowed to the RHC. The Agency estimates the additional dollar amount it would take for the RHC to be paid their entire encounter rate, which is equal to the [Fee-For-Service] rate.

CP at 13-14.

16

The Clinic argues that the Board's finding that the Agency "will recoup" any overpaid enhancement payment is not supported by the record. Br. of Appellant at 10. The Clinic argues that the more proper "manifestation of the intent" of the enhancement payment process is that enhancement payments are to ensure that the total amount received by the RHC "at least equals to that of the encounter rate. Br. of Appellant at 11. The Clinic contends that the enhancement payment process exists to ensure that RHCs are paid at least the minimum amount owed, and does not exist to take away any payment made in addition to that minimum amount.[8]

The testimony of Sandra Cashman supports the Board's finding. Cashman testified that if an RHC has been overpaid, the Agency will recoup the amount that it overpaid and that if the RHC was underpaid, the Agency would pay the RHC the difference. Finding of fact 12 is supported by substantial evidence.

The Clinic also assigns error to the Board's finding of fact 20, which states:

> To ensure that the appropriate supplemental payments (called enhancements) are made to each RHC, the Agency performs an annual reconciliation of the enhancement payments. The Agency will compare the amount actually paid to the amount determined by the following formula: (Managed Care encounters [based on Rosters]) x (encounter rate) less (FFS equivalent of MCO services). If the clinic has been overpaid, the Agency will recoup the appropriate amount. If the clinic has been underpaid, the Agency will pay the difference.

CP at 16 (citation omitted).

---

[8] The Clinic again appears to argue that the Board's finding is an improper conclusion of law. Specifically, that the intent behind enhancement payments does not stand for the notion that the Agency can take away overpaid enhancement payments. It appears that the Clinic argues that the Board improperly interpreted the law regarding enhancement payments to preserve these claims for a different tribunal. Because the only issue on review here is whether the Board's findings are supported by substantial evidence and whether those findings support the Board's conclusion that equitable estoppel applies, this court should not address the Clinic's arguments because they appear to be solely for purposes of preserving its objections.

17

The Clinic again argues that the Board's finding that the Agency performs an annual reconciliation of the enhancement payments is incorrect. As discussed above, Cashman testified that the Agency conducts an annual reconciliation. Therefore, the Board's finding is supported by substantial evidence.

The Clinic also assigns error to the Board's finding of fact 30, which states:

> Jenise Mugler is employed at [the Clinic] in various positions, as the General Administrator, Secretary, Treasurer and Director. She has been employed at [the Clinic] for twenty-two years. In September 2005, [the Clinic] became part of the state's RHC program. Within the RHC program, [the Clinic] sees both private and public pay clients. [The Clinic] is an RHC that sees mainly lower income children who are located in a rural area and underserviced by providers and other medical personnel. [The Clinic] is located in Lewis County, which is a heavily public-subsidized county. [The Clinic]'s designation as an RHC provides that the clinic will supply needed medical services to low income children and families. She is familiar with the billing process for MCOs. Her understanding is that the MCO pays the clinic directly for a claim that is made for an encounter that was made. In 2009, when the Agency paid enhancements, [the Clinic] was sent a check by the state based upon what the Agency calculated was owed to [the Clinic] for the number of lives assigned to the clinic for that month. Her understanding is that an enhancement payment is in addition to an encounter payment. She has believed this to be the case since 2005, when it was explained to [the Clinic] that enhancements would be an additional source of income to encounters. Based on Exhibit 2 and Finding of Fact 18, this belief was not reasonable.

CP at 19 (citations omitted).

The Clinic argues that the Board improperly determined that Mugler's belief that enhancement payments were additional income for the Clinic was unreasonable. The Clinic argues that this finding is neither a finding nor an appropriate determination and is also not supported by substantial evidence. We hold that this finding of fact is supported by substantial evidence.

Evidence supports the finding that Mugler's belief was unreasonable. The Board found that the Clinic had notice as early as 2008 that the enhancement payments were to be reviewed

18

under a reconciliation process and that the Agency was developing a plan to recoup any overpayment. Additionally, the Board found that an enhancement payment is paid to supplement the payment that RHCs receive from MCOs in order to make the RHCs whole. A reasonable person, with knowledge about the potential for recoupment of overpayments and knowledge about the overarching enhancement payment scheme would not consider enhancement payments to simply be additional income. The Board's finding is therefore supported by substantial evidence.

## II. THE BOARD'S CONCLUSIONS OF LAW ON EQUITABLE ESTOPPEL

The Clinic argues that the Board incorrectly concluded that the Clinic failed to establish all elements of equitable estoppel by clear, cogent, and convincing evidence.[9] We disagree.

A. *Legal Principles*

When reviewing an administrative agency decision, we review de novo an agency's conclusions of law and its application of the law to the facts. *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 817, 306 P.3d 920 (2013). We review the record to see whether substantial evidence supports the findings of fact and whether the superior court's conclusions of law flow from these findings. *Nelson v. Washington State Dep't of Labor & Indus.*, 175 Wn. App. 718, 723, 308 P.3d 686 (2013).

---

[9] The Clinic challenges the Board's conclusions of law 19, 20, 21, 23, 24, 25, 26, 27, and 28. Because the Clinic only asks us to address the issue of equitable estoppel, we need not address the Clinic's challenges to conclusions of law 13, 14, and 15. These conclusions are unrelated to whether the Clinic established all elements of equitable estoppel by clear, cogent, and convincing evidence.

No. 49569-4-II

Equitable estoppel is a legal doctrine that may be used only as an affirmative defense. WAC 182-526-0495.[10] There are five elements of equitable estoppel. These elements are:

> (a) [The Agency] made a statement or took an action or failed to take an action, which is inconsistent with a later claim or position by [the Agency].
> (b) The party reasonably relied on [the Agency]'s original statement, action or failure to act.
> (c) The party will be injured to its detriment if [the Agency] is allowed to contradict the original statement, action or failure to act.
> (d) Equitable estoppel is needed to prevent a manifest injustice. Factors to be considered in determining whether a manifest injustice would occur include, but are not limited to, whether:
> (i) The party cannot afford to repay the money to [the Agency];
> (ii) The party gave [the Agency] timely and accurate information when required;
> (iii) The party did not know that [the Agency] made a mistake;
> (iv) The party is free from fault; and
> (v) The overpayment was caused solely by an [Agency] mistake.
> (e) The exercise of government functions is not impaired.

WAC 182-526-0495.

The party asserting equitable estoppel against the Agency must prove each element of estoppel by clear, cogent, and convincing evidence. WAC 182-526-0495. Under this burden of proof, the trier of fact must be convinced the fact at issue is "highly probable." *Bale v. Allison*, 173 Wn. App. 435, 453, 294 P.3d 789 (2013) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

---

[10] The Clinic cites to the equitable estoppel elements cited in WAC 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, the rule addressing equitable estoppel in DSHS actions. We rely on WAC 182-526-0495, because that rule specifically addresses equitable estoppel under HCA proceedings.

B.     *Equitable Estoppel Not Proven*

The Clinic argues that the Board incorrectly concluded that the Clinic failed to prove all necessary elements of equitable estoppel as required under WAC 182-526-0495.[11] We disagree and hold that the Board's findings of fact support its conclusion that the Clinic has not proven by clear, cogent, and convincing evidence that equitable estoppel applies.

1. *Reasonable Reliance*

The Clinic argues that the Board incorrectly interpreted the element of reasonable reliance.[12] The Clinic asserts that it was reasonable for the Clinic to rely on the Agency's conduct of sending monthly enhancement payments which the Clinic construed as incentive to continue to operate as a RHC. The Clinic also argues that it had "nothing to do" with any part of the enhancement payment process and that it simply received a check each month with "no explanation." Br. of Appellant at 13. We hold that the Board's findings support its conclusion that the Clinic failed to prove that it reasonably relied on the Agency's overpayment.

The Board's finding make clear that the Clinic had full notice of federal Medicaid statutes and instructions from the federal government about the reconciliation and enhancement

---

[11] The Board concluded that the Clinic met its burden in proving both the first and third element of equitable estoppel. Neither party addresses the first and third elements in their briefing nor do the parties challenge the Board's conclusions regarding those elements on appeal. Therefore only elements of equitable at issue here are the second, fourth, and fifth elements.

[12] The Clinic argues that the Board incorrectly interpreted the law with respect to equitable estoppel. When reviewing an administrative agency decision, this court reviews issues of law de novo. *Ames v. Washington State Health Dep't Med. Quality Health Assurance Comm'n*, 166 Wn.2d 255, 260, 208 P.3d 549 (2009). However, the Board's conclusion that the Clinic has not met its burden to show that equitable estoppel applies is a conclusion of law based on the facts of this case and this conclusion is reviewed to determine if the findings of fact support the Board's conclusion. *Nelson*, 175 Wn. App. at 723.

payment process. The Clinic signed a core provider agreement with the Agency in 2005, thus subjecting the Clinic to state and federal laws as well as Agency rules, regulations, memoranda, billing instructions, and other agency documents. It is well established that parties are presumed to know the laws they are subject to. *Barson v. Dep't of Soc. & Health Servs.*, 58 Wn. App. 616, 618 n. 1, 794 P.2d 538 (1990). It follows then that in 2009, at the time of the reconciliation in 2009, the Clinic had reasonable notice of, 42 U.S.C. § 1396a (bb)(6)(B), the federal statute requiring that the Agency's enhancement payments made to RHCs must make the total payment received by the RHCs at least equal to the payment RHCs would be paid under the PPS or APM. *See* 42 U.S.C. § 1396a (bb)(6)(B).

Additionally, under federal regulations and as a result of the 2006 audit, the Agency created a State Plan Amendment establishing that the Agency procedures were in conformity with federal regulations. *See* 42 C.F.R. § 430.10. Specifically, the Agency developed a methodology for making enhancement payments to RHCs that was consistent with federal statutes and regulations. The federal government approved the State Plan Amendment and the enhancement payment methodology, and the amendment became effective in July 2008. The federal regulations, the audit results, and the State Plan Amendment were all in place in 2008 and the Clinic, through its core provider agreement, was on notice of them and subject to comply with them.

Moreover, the Clinic received a letter in 2008 from the Agency informing the Clinic of the results of the audit and the Agency's noncompliance with the enhancement process. The letter informed the Clinic that the Agency was working to create enhancement rates that were complaint with the audit results and federal law. The 2008 letter also referred to the Agency's

expectation of reconciling payments and developing a process for when underpayments and overpayments existed. The Agency again notified the Clinic in June 2009 about the upcoming reconciliation and informed the Clinic that if the reconciliation results showed that the Agency had made an overpayment, the Clinic would be responsible for the overpayment.

Based on these facts, it was not reasonable for the Clinic to believe that it would never be required to repay overpaid enhancement payments or that the enhancement payments were simply "additional" income. It also was not reasonable for the Clinic to rely on the Agency's overpayment as the Clinic was on notice of the contingent nature of the enhancement payments. Accordingly, the Board's conclusion that the Clinic failed to meet its burden to show that it reasonably relied on the Agency's action of overpayment of enhancement payments or that any overpayment would not be recovered by the Agency, is supported by the findings of fact.

Because the Clinic has failed to meet its burden to show that it reasonably relied on the Agency's overpayment it has failed to establish this element of equitable estoppel.

2. *Impairment of Government Functions*

The Clinic contends that the Board incorrectly interpreted the law by concluding that the exercise of government functions would be impaired if the Agency was precluded from recouping the overpayment.[13] Specifically, the Clinic argues that preventing the Agency from

---

[13] The Clinic argues that the Board incorrectly interpreted the law with respect to impairment of government functions. However, the Board's conclusion that the Clinic has not met its burden to show that exercise of government functions would be impaired if the Agency was precluded from recouping the overpayment, is a conclusion of law based on the facts of this case. This conclusion is reviewed to determine if the findings of fact support the Board's conclusion, *Nelson*, 175 Wn. App. at 723, and whether the conclusion is legally erroneous. *Skamania Cty. v. Columbia River Gorge Comm'n*, 144 Wn. 2d 30, 42, 26 P.3d 241 (2001).

collecting the overpayment would not stop the Agency from reconciling enhancement payments, but would only prevent it from collecting "improper overpayments." Br. of Appellant at 14. The Clinic argues that there is no federal law requiring the Agency to recoup overpaid enhancement payments and therefore no government impairment is caused by preventing the recoupment. We disagree and hold that the Board's findings of fact support its conclusion that the exercise of government functions would be impaired if equitable estoppel prevented recoupment of the overpayments.

CMS authorized the Agency's enhancement payment and reconciliation process in 2009 after the Agency amended its process. CMS approved the amended plan which required the Agency to pay estimated enhancement payments to RHCs throughout the year followed by a reconciliation of those payments to determine if enhancement payments brought the RHCs total to an amount exactly equal to what the RHC were entitled to receive. Thus, it is clear that any restriction on the Agency's ability to collect enhancement overpayments would impair the Agency from obeying its federal Medicaid mandate, which is to ensure that the Agency operates a payment system that supports "efficiency, economy, and quality of care" by ensuring that clinics are paid the appropriate amount. *See* AR at 119.

The Clinic has not clearly shown that government functions would not be impaired if the Agency was precluded from recouping the $74,634 of the remaining overpayment debt. Therefore, the Clinic has not established this element of equitable estoppel.

Because the Clinic has failed to meet its burden to show that it reasonably relied on the Agency's overpayment and that government functions would not be impaired, the Clinic has failed show by clear, cogent, and convincing evidence that it has established all five elements of

No. 49569-4-II

equitable estoppel. Therefore, we do not address the other elements. WAC 182-526-0495 (The party asserting equitable estoppel must prove *all* elements by clear and convincing evidence.). Accordingly, the Board's conclusion that equitable estoppel does not preclude the Agency from recovering the overpayment is not improper and is supported by the findings.

### III. ATTORNEY FEES

In its conclusion, the Clinic appears to request appellate costs and reasonable attorney fees. RAP 18.1 permits us to grant attorney fees to a party entitled to them under applicable law. But RAP 18.1(b) requires an appellant to include a section of its opening brief to the request for the fees or expenses. Here, the Clinic failed to include a separate section for attorney fees as required. Moreover, the Clinic does not cite any specific statute or case entitling it to attorney fees and costs on appeal. Thus, the Clinic is not entitled to attorney fees and cost.

We affirm the Board's decision.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Bjorgen, J.

Melnick, J.

25